Leo M. Harvey v. Commissioner. Lena P. Harvey v. Commissioner.
Harvey v. Commissioner
Docket Nos. 7116, 7117.
United States Tax Court
1947 Tax Ct. Memo LEXIS 269; 6 T.C.M. (CCH) 312; T.C.M. (RIA) 47069; March 24, 1947
George T. Altman, Esq., 215 W. 7th St., Los Angeles 14, Calif., for the petitioners. E. A. Tonges, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Docket No.
1939
1940
1941
7116 Leo M. Harvey
$2,356.83
$5,225.29
$8,069.72
7117 Lena P. Harvey
2,356.84
5,225.29
8,069.72
The questions are (1) whether the gain realized by petitioners on account of the installment sale of certain patents *270 constituted capital or ordinary gain, and (2) whether certain percentages of the sales price paid by petitioners to others can properly be excluded or deducted by petitioners from the sales price received by them. Petitioners filed separate returns for the taxable years with the collector of internal revenue for the sixth district of California at Los Angeles on a community and accrual basis. The cases were consolidated for hearing. Findings of Fact Petitioners are husband and wife residing in Los Angeles. Unless otherwise indicated petitioner will hereinafter refer to petitioner Leo M. Harvey. By written agreement dated March 21, 1938, petitioner sold certain patents and applications for patents, both foreign and domestic, to the Gerrard Company, Inc., hereinafter referred to as Gerrard. The patents so sold by petitioner covered inventions in the round wire tying and the flat band strapping and tying fields. As here material, Gerrard paid petitioner as consideration $25,000 cash upon execution of the agreement and delivered to petitioner 10 negotiable promissory notes, each in the amount and each having then a fair market value of $40,000, all dated April 2, 1938, numbered 1 *271 to 10, inclusive, and maturing serially commencing April 2, 1939, and thereafter on April 2 of each succeeding year through April 2, 1948. These notes were tendered and accepted as payment. During the taxable years here involved these notes were paid when due. By written agreement and under circumstances hereinafter described petitioner paid his son Lawrence 20 per cent of the proceeds of the sale as received by petitioner. Petitioner also paid certain amounts to his brother Herbert from such proceeds. Herbert was thus paid $2,500 in each of the taxable years here involved. In reporting the proceeds of the sale for income tax purposes petitioners excluded or deducted from the sales price certain amounts on account of such obligations or payments to Lawrence and Herbert. The remainder of the sales price was reported on the installment basis and treated as capital gain, each petitioner reporting a community one-half. Thus, petitioners reported as taxable gain to be taken into account from the sale the amount of $15,828.72 for each of the taxable years here involved, each petitioner reporting a community half thereof, or $7,914.37. [1] Respondent determined that the entire proceeds *272 received constituted ordinary income to petitioners and not capital gain. Respondent in this connection stated: It is determined that the entire $40,000.00 received in each year is taxable as ordinary income. Your community share of this income has accordingly been increased in each year by the amount of $2,085.63 from the $7,914.37 (total reported as above) to $20,000.00. Petitioner's son, Lawrence, was an attorney about 28 years old in 1938. He assisted petitioner in negotiating the sales contract with Gerrard. Petitioner agreed in writing dated April 2, 1938, to compensate Lawrence for his efforts in this connection by paying him 20 per cent of all proceeds of the sale as received by petitioner. Under this agreement petitioner paid Lawrence $8,000 a year during the taxable years. Petitioner also employed as attorneys in connection with the Gerrard deal, Max Schlesinger, who handled the tax aspects, one Rubin and a Walter Sheldon. Walter Sheldon was paid $22,500 in 1938 by petitioner for his services, which services among others concluded Sheldon's work in connection with the Gerrard sale. *273 Petitioner's brother, Herbert, had been an employee of petitioner since about 1918 on a salary ranging from $500 to $1,500 a month. Petitioner, since about 1914, had been sole proprietor of a business known as Harvey Machine Company. This business consisted primarily of making industrial machinery on special order. Herbert was employed in connection with this business. Petitioner with the advice and assistance of Herbert had commenced developing inventions in the wire tying field in the middle 1920's and subsequent thereto and from time to time obtained the patents later sold to Gerrard. The expense of developing these inventions were deducted as business expenses of Harvey Machine Company. Sometime in 1930 petitioner licensed Gerrard to operate under certain of the flat wire tying patents at a minimum royalty of $30,000 a year, which petitioner received from 1931 to 1937, inclusive. In 1938 and by the terms of the sales contract Gerrard agreed to pay petitioner certain amounts on account of royalties due up to and including March 31, 1938. These royalty payments were reported by petitioner as income from the business of Harvey Machine Company. Petitioner had paid Herbert 10 per *274 cent of the $30,000 annual minimum royalty received by petitioner from Gerrard. The sales contract with Gerrard stated that it was understood between the parties that the patents involved and referred to as owned by petitioner included not only those owned by petitioner but "also patents, patent applications and inventions, if any, owned by Herbert Harvey * * *". Opinion While it may be doubtful whether the patents involved constituted petitioner's stock in trade or property of a kind which would properly be included in inventory or property held primarily for sale to customers in the ordinary course of business, we think it is clear that such patents constituted property used in the trade or business of a character which is subject to the allowance of depreciation. Such patents did not, therefore, constitute capital assets within the meaning of section 117 (a) of the Internal Revenue Code, and the gain from their sale was ordinary income and not subject to the percentage limitations of section 117 (b). The development and patenting of the inventions and the licensing appears to us a normal, logical and natural phase of petitioner's business of machinist. *275 The expenses of developing the inventions were deducted as business expenses and the royalties were treated as income of the business. Petitioner received a minimum royalty of $30,000 a year for at least seven years or a total of $210,000 before their final sale for $425,000. It is impossible for us to consider petitioner's income-producing activities in connection with these patents as a mere hobby or recreation or as an isolated or casual affair such as to characterize them in terms other than those connotating business use. We are satisfied that the record supports the conclusion that petitioner used the patents in his business. That such patents, under the circumstances, were subject to the allowance for depreciation provided in section 23 (1) seems sufficiently apparent as to require no discussion. Petitioner argues that the patent activities had no connection with his business which was making machines on special order. Petitioner further argues that the mere passive role of receiving royalties cannot be considered a business. We think these arguments subject the facts to a strained and unnatural interpretation. We can see no reason or necessity for limiting the scope of petitioner's *276 business carried on in the name of Harvey Machine Company to the making of machinery on special order and excluding therefrom the inventive activity that did in fact co-exist in the making of machinery. The expenses of this inventive activity were deducted as a business expense of Harvey Machine Company and the royalty income was included as income of the Harvey Machine Company. Nor do we consider it realistic to look only at the receipt of royalties divorced from the efforts and accomplishments leading up to such receipt and to say such passive receipt does not constitute a business. We conclude therefore that the patents in question were used by petitioner in his business and were subject to depreciation. It follows that they were not capital assets and that the gain from their sale constituted ordinary income as respondent determined. Petitioner does not contend that Lawrence had an interest in the patents but does contend that the 20 per cent of the sales price paid to Lawrence constituted a necessary expense of the sale. Inter-family transactions inevitably invite special scrutiny and in the instant case we are not satisfied and do not think petitioner has sufficiently established *277 the nature and value of Lawrence's services. Lawrence was an attorney and did render some assistance to his father but other lawyers were also on hand and we know that at least one of them received very substantial payments for his services. The amount of $85,000 promised Lawrence seems to us an almost incredible fee for the nebulous services described in the record. We cannot but believe that Lawrence's filial status more than his services were determinative. Lawrence did not testify at the hearing. We have only petitioner's very vague recitations as to his son's services. Under these circumstances we must conclude that petitioner has failed to sustain the burden of proof. It follows that respondent's determination in this connection must be sustained. Petitioner paid certain amounts of the sales price to Herbert, his brother. In this connection petitioner argues that Herbert had an interest in the patents and that the amounts paid him constituted payments for such interest. There is no evidence in the record supporting the conclusion that Herbert had a property interest in the patents. Herbert assisted petitioner in his work on the inventions and his advice was invaluable to petitioner. *278 Petitioner paid him a salary as an employee and further paid him a percentage of the royalties but there is nothing to indicate that such percentage was not merely a manner of compensating Herbert for his services in addition to his regular salary. So far as we can determine none of the patents was in Herbert's name nor is there anything in the record to indicate that petitioner had been or was under any legal obligation either to pay Herbert a percentage of the royalties or a percentage of the sales price. The sales contract, it is true, states that the patents subject to the sale are intended to include those, if any, owned by Herbert but this statement is far from proof that Herbert had in fact any interest or that petitioner was obliged to compensate him for any such interest. Under these circumstances we think petitioner has failed to establish the payments to Herbert as either exclusions or deductions from the sales price. It follows that respondent's determination in this connection must also be sustained. With respect to the question of accelerated amortization petitioner has agreed to abide by respondent's adjustments thereof. In the petition petitioner raised a question *279 concerning the proper amount deductible on account of California franchise taxes. This question was not discussed by either party on brief. Since the determination of this Court with respect to petitioner's liability for Federal income taxes affects the amount of the franchise tax due the State of California the proper amount deductible for such taxes can be determined under a Rule 50 computation. Decisions will be entered under Rule 50. Footnotes
1. The figure of $7,914.37 was the one actually reported rather than $7,914.36.↩